the Chincha islands via Callao to New York. The guano deposit on the Chincha islands (exhausted since the commencement of this action) belonged to the government of Peru. That government exported the guano to foreign countries, and there sold it for account of the government. Its exportation by any other parties was prohibited, and it was not bought and sold in Peru as an article of commerce. What was there used was given to the Peruvian subjects who might go to the islands, and dig it, to be used in Peru alone. Some of the little so given away was sold in Peru at $12 00 a ton, in gold, but subject to the above stated limitations as to its use.

The cargo in question, if it had arrived in New York, would there have sold for $60 00 a ton, gold. When destroyed it was very near to, but not within, the harbor of New York. Upon this state of facts, the government of Peru claims to be entitled to recover the value of this cargo at the time and place of loss; and it is contended that, upon the evidence, the only proper mode of ascertaining that value is to take the market price of the article in New York, less all costs and charges that would have been incurred from the time of the loss till it could have been placed in New York ready for sale.

The claimants contend that the value of the cargo to the Peruvian government must be taken to be simply the cost of preparing the guano for shipment, and charges incident to shipment, according to which method the Peruvian government would recover $1,-424 20 for the loss of this cargo.

As between these two positions, my judgment is with the libellants. It is not necessary, in order to support this determination, to discuss the correctness and justice of the result which has been sometimes arrived at by the application of the rule which gives to the owner of cargo damaged by collision the market value of his goods at the place of shipment as a complete indemnity for his loss. While it may be conceded that experience has shown this rule to be the best one that can be resorted to in most cases, I do not understand that, as matter of law, the rule is always to be applied. The principle of indemnity to the extent of the loss sustained is the unquestioned law of every case; and to this higher law every rule of convenience must be subject, not excepting the one here sought to be applied by the respondents. The result of the application of such a rule to the present case indicates at once that no principle of justice will permit its adoption here. Resort to it is in truth impossible here, for it is based upon the existence, at the place of shipment, of the market price for the merchandise lost. But there never was a market price for guano at the Chincha islands.

The article, owing to peculiar circumstances, had neither market price nor ascertainable cost at the place of shipment.

Yet it was then an article of value; and this particular cargo of it on board the ship Kate Dyer, at the time and place when it was destroyed, could have been exchanged for gold at a large price and without difficulty. The facts then forbidding resort to a market price of this cargo at the place of shipment, by which to determine the value, it becomes necessary to find some other method whereby to ascertain its value at the time and place of loss. No other method seems more likely to work out the desired result than to take the market price of such guano at the near and controlling market of New York, whither the cargo was bound, and where, at the time of destruction, it could have been sold to arrive. The value of the cargo, calculated at this price, less the costs and charges, will represent with much accuracy the real loss sustained by its owners in its destruction.

The items of costs and charges properly to be deducted in a calculation thus based appear not to be in dispute; nor is there any dispute in respect to the freight. I, therefore, leave to the parties the computation of the amounts, in accordance with the views here expressed, with leave to settle the decree before me, if any dispute arises.

## Case No. 4,227.

In re DYKE et al.

[9 N. B. R. (1873) 430.] [1]

District Court, E. D. Michigan.

LONGYEAR, District Judge. The bankrupts were partners in trade, and as such were doing business, at the time of the bank-

[1] [Reprinted by permission.]

ruptcy, as druggists, at No. 112 Griswold street, Detroit. They were successors to the late firm of Humphrey & Dyke, composed of one W. Humphrey and the said Thomas J. Dyke, formerly doing business at the same place. The said late firm of Humphrey & Dyke held the store and premises where they carried on business, as tenants of the petitioner, by virtue of a lease bearing date December 1st, 1872. The lease was for the term of four years and three months from date, at the yearly rent of six hundred dollars, payable monthly in advance; and it contains a ₁ covenant "that all goods, wares and merchandise, household furniture, fixtures, or other property, which are or shall be placed in or on said premises by them, shall be liable, and this lease shall hereby constitute a lien or mortgage on said property, to secure the rent due or to grow due on this lease." And the lessor is authorized in case of default "to enter upon said premises, or take any of said mortgaged property, wherever the same may be found, and sell and dispose of the same in the same manner as in case of chattel mortgage on default thereof, giving six days' notice," etc., and all benefit of exemption laws are waived. Humphrey & Dyke occupied the store under this lease until July 20th, 1873, when Humphrey sold and transferred his interest in the stock, furniture and fixtures, to the bankrupts and retired, the latter agreeing to pay the debts of the former firm. The bankrupts occupied the store and carried on business until their bankruptcy, about September 4th, 1873. The lease was not filed as a chattel mortgage in the office of the city clerk of Detroit until after Humphrey had sold to the bankrupts, but it was so filed on the 1st day of August, 1873. The bankrupts, as a matter of fact, occupied the store under the terms of the lease; but, as filed in the city clerk's office, the lease was not accompanied by any evidence of that fact. No rent had been paid since about the middle of February, 1873, and the amount in arrears at the time of the bankruptcy was three hundred and thirty dollars, which, together with three dollars and thirty-four cents for water rates paid by petitioner, he has proved in this court as a secured debt, and now asks that the same may be paid as such out of the proceeds of the store furniture and fixtures put into the store by Humphrey & Dyke, and transferred to the bankrupts. To this the assignee, on behalf of the creditors of the bankrupts, Dyke & Marr, objects.

In the first place, the covenant in the lease for a lien, etc., is not a mortgage, because it does not purport to change, in any way, the title to the property. It gives no right in the property itself until reduced to possession under the power to take possession and sell; and I think it admits of much doubt whether the mere agreement for a bare lien placed the petitioner upon any better footing than other creditors, before actual possession under the power. Holmes v. Hall, 8 Mich. 66. My opinion is that the assignee having obtained possession, whatever lien petitioner may have had is gone, and cannot be enforced as against the other creditors. In re Joslyn [Case No. 7,550]. But it is not necessary to rest the case upon this point alone. By the statutes of Michigan (2 Comp. Laws 1871, p. 1458, § 4706) it is provided as follows: "Every mortgage or conveyance intended to operate as a mortgage, of goods and chattels which shall hereafter be made, which shall not be accompanied by an immediate delivery and followed by an actual and continued change of possession of the things mortgaged, shall be absolutely void as against the creditors of the mortgagor, and as against subsequent purchasers or mortgagees in good faith, unless the mortgage, or a true copy thereof shall be filed in the office of the township clerk of the township, or city clerk of the city, or city recorder of cities having no officer known as city clerk, where the mortgagor resides," etc. Therefore, even if considered as a mortgage, or as "intended to operate as a mortgage," the covenant in the lease that it should "constitute a lien or mortgage on said property," was absolutely void as against all the creditors of the original lessees, Humphrey & Dyke, because it was not filed until after that firm had ceased to exist; and it was equally void as against the creditors of Dyke & Marr, the bankrupts, because it was not their covenant, and it was not accompanied by any notice or evidence that they held the property subject thereto. It results that the prayer of the petition must be denied, but without costs to either party as against the other.

---

## Case No. 4,228.

Ex parte DYSON.

[3 App. Com'r Pat. 375.]

Circuit Court, District of Columbia. Sept. 21, 1860.